PEATROSS, J.
| ,On January 11, 2010, the juvenile defendant, R.G., was charged with two counts of armed robbery, in violation of La. R.S. 14:64, and two counts of armed robbery with the use of a firearm, in violation of La. R.S. 14:64.3. On February 23, 2010, following an adjudication hearing, R.G. was adjudicated delinquent of two counts of first degree armed robbery, in violation of La. R.S. 14:64.1. Counts three and four, armed robbery with the use of a firearm, were dismissed. On March 17, 2010, R.G. was sentenced to serve three years in the continued custody of the Department of Public Safety and Corrections, Office of Juvenile Justice, with credit for time served and with a recommendation for the fast track program. R.G. now appeals. For the following reasons, R.G.’s convictions and sentence are affirmed.

FACTS

On June 29, 2009, at approximately 11:30 p.m., Arthur Graham and Mardarius Evans were at a friend’s house near LSU Medical Center in Shreveport, Louisiana. Evans got into an argument with one of his friends and left the residence, walking north on Linwood Avenue toward Kings Highway. Graham ran after Evans to calm him down and the two walked together for a few minutes, ultimately turning left onto Kings Highway.
As Graham and Evans walked under a railroad overpass, they were approached by two young black males, one riding a bicycle and the other walking. One of the boys pulled out a gun and told Graham and Evans to give him everything they had. Evans handed over his cell phone, wallet, eyeglasses and earrings. Graham turned over his cell phone. The two |2robbers then left together on the bicycle, Evans ran off in the direction of Mansfield Road and Graham ran to LSU Medical Center to phone police.
While responding to the scene, officers spotted a black male, Z.R., matching the description of one of the perpetrators given by the victims. Z.R. was riding a bike and fled from officers. When he was apprehended, a gun was found nearby. Both victims were transported to the scene of the arrest and both identified Z.R. as one of the robbers. After Z.R., a juvenile, was adjudicated delinquent and sentenced for committing armed robbery in violation of La. R.S. 14:64 and armed robbery with the use of a firearm in violation of La. R.S. 14:64.3, he informed the prosecutor’s office that R.G. was the other perpetrator of the robbery. This information was then communicated to Officer Russell Ross, one of the investigating officers of the robbery, who subsequently prepared a photographic lineup. One of the victims, Graham, was asked to view the photographic lineup and he positively identified R.G. as the other person who had committed the robbery. Consequently, R.G. was arrested on December 16, 2009.
R.G.’s hearing was held on February 8, 2010. The State called Officer Ross as its first witness. Officer Ross testified that, *59 after initially arresting Z.R., he continued to look for the other suspect that evening, but did not find him. He then received information from the prosecutor’s office that R.G. had been implicated by Z.R.[1] as the other perpetrator of the robbery. On receiving this information, Officer Ross conducted a photographic lineup on August 28, 2009, wherein one of the victims, | sGraham,[2] positively identified R.G. as the other perpetrator of the robbery.[3] After Graham’s positive identification of R.G. as the other robber, Officer Ross continued to search for R.G., but learned that he was in juvenile detention at the time. Officer Ross testified that he was under the impression that R.G. was in custody somewhere outside of Shreveport. R.G. was released from custody in September 2009, and Officer Ross arrested R.G. on December 16, 2009.
Officer Ross testified that, while a gun and a bike were found in Z.R.’s possession or close to him on the night of the robbery, there was no such physical evidence linking R.G. to the robbery. Further, no fingerprint analysis was taken of the gun because it was contaminated at the scene.
The State’s next witness to testify was one of the robbery victims, Graham. Graham recounted the details of the night he was robbed and explained that the other victim, Evans, had gotten into an argument with another friend and left the friend’s house upset. Graham went after Evans to calm him down and to try to get him to go back inside the house. Graham testified that, as he and Evans were walking, he saw two young men across from the LSU Medical Center parking lot, one on a bicycle and one walking. As Graham and Evans crossed under the railroad bridge overpass on Kings Highway, the young men approached them and one of them, whom Graham identified at trial as R.G., pulled out a gun and said “give me | ¿everything you got.” Graham testified that Evans then handed R.G. everything he had on him and Graham handed over his cell phone. At that point, the two robbers both got onto the bike and rode back down Kings Highway toward LSU Hospital. Evans ran in the other direction, toward Mansfield Road, and Graham went to LSU Hospital to call the police.
Graham testified that, when he was near LSU Medical Center in an area that was well lit, he got a good look at the young man who took his cell phone, whom he identified in the courtroom and in the photographic lineup as R.G. Graham stated that he kept his eyes on both of the young men as they approached from LSU Medical Center prior to the robbery because they were walking in front of them.
Graham testified that he did not consume any alcohol during the three to four hours preceding the robbery and that he did not use drugs. He also testified that he did not see Evans consume any alcohol or illegal drugs. Graham testified that the robbery occurred very quickly, that he did not know R.G. prior to the robbery and that, during the robbery, Z.R. was holding the bike and R.G. was holding the gun.
*60 Graham further testified that, when he called police the night of the robbery to give a description of the robber later identified as R.G., he told police that R.G. had either dreads or “wild braids.” Graham explained that, while he did not focus on memorizing every attribute of the robber, he did remember enough to identify him. Graham also testified that he saw R.G. standing in front of a car in which he was riding approximately a month |safter the robbery at the corner of Hollywood and Hearne Avenue and that, when Graham saw R.G., R.G. looked at Graham and laughed.
Graham explained that, when he went to the police station to view the photographic lineup, Officer Ross told him that the pictures were a little outdated. He testified that Officer Ross did not indicate which person in the lineup he believed committed the robbery and did not divulge that he had any information linking R.G. to the crime.
The next witness called by the State was Evans, the other robbery victim. Evans testified that, on June 29, 2009, he was at a friend’s house where he got into an argument with someone and left. When Evans left, Graham followed after him and the two walked together on Kings Highway until they came under a railroad bridge overpass and were robbed by two young men. Evans explained that Z.R. and R.G. initially passed by him and Graham and then turned around and came back and robbed them. Evans testified that, when one of the boys, whom he later identified as R.G., pulled a gun on them, Evans handed over his cell phone, wallet, glasses and earrings and Graham handed over his cell phone. Evans testified that he handed over his possessions to the two young men because he was afraid for his life.
Evans testified that the robbery occurred close to 11:00 p.m. and that he saw Z.R. and R.G., one on a bike and the other on foot, while he and Graham were walking past the Burger King on Kings Highway. Evans explained that, at the time of the robbery, he was no longer upset about the fight with his friend. He testified that he could not remember what R.G. |fiwas wearing at the time of the robbery, but that he described R.G. to police as having braids or dreadlocks, that he looked about 19 or 20 years old and was dirty, rugged and thuggish. Evans further testified that, while no one showed him the photographic lineup of R.G., he “vividly remembered” who robbed him and was able to identify R.G. as one of the robbers when he first walked into the courtroom. Evans explained that R.G. was right in front of him and Graham during the robbery, pointing the gun back and forth at each of them. When questioned about his certainty of correctly identifying R.G. as one of the robbers, Evans testified he was “100 percent sure that’s him.”
The State rested its case after Evans’ testimony and R.G. moved for an acquittal, which was denied by the trial court.
The first witness called to testify on behalf of R.G. was Officer Matthew Gry-der, one of the officers from the Shreveport Police Department who investigated the robbery. Officer Gryder testified that, while en route to LSU Medical Center, he encountered a young man about seven or eight blocks from the hospital who matched the description of one of the robbers and was later identified as Z.R. He was riding a bicycle and heading south. When Officer Gryder and the other responding officer attempted to stop the suspect, he dropped the bike and fled on foot. Officer Gryder testified that they found a gun when they caught the fleeing suspect, Z.R., but that none of the items taken from Evans and Graham were found on Z.R. Evans and Graham were then brought to *61 the area where Z.R. was apprehended and both victims identified Z.R. as one of the robbers.
17After apprehending Z.R., Officer Gry-der then went to Z.R.’s parents’ house to obtain permission from them to interview Z.R. Z.R.’s parents agreed and followed Officer Gryder to the police station where Z.R. and his parents were subsequently interviewed. Officer Gryder was not involved in the interview with Z.R.’s parents.
The next witness called to testify on behalf of R.G. was Muriel Burns, manager of the Caddo Parish Juvenile Detention Center (“the Center”). Ms. Burns testified that she knew both R.G. and Z.R. when they were incarcerated at different times at the Center and that R.G. was at the Center from July 21through July 30, 2009. Ms. Burns could not remember whether R.G. had braids when he was at the Center but testified that he did not have dreadlocks. Ms. Burns further testified that R.G. had facial hair in the past, but she could not remember if he had facial hair in July 2009. Ms. Burns stated that she did not know whether R.G. and Z.R. were friends.
R.G. then took the stand, denied involvement in the robbery and stated that he was not friends with Z.R. The defense proffered testimony that Z.R. had previously told R.G., “I’ve got a cake baked for you.”
As previously stated, at the conclusion of the trial on February 23, 2010, R.G. was adjudicated delinquent of two counts of first degree armed robbery, pursuant to La. R.S. 14:64.1, with counts three and four dismissed, ie., armed robbery with use of firearm pursuant to La. R.S. 14:64.3. On March 17, 2010, R.G. was sentenced to serve three years in the continued custody of the Department of Public Safety and Corrections, Office of |¾Juvenile Justice, with credit for time served and with a recommendation for the fast track program. R.G. now appeals.

DISCUSSION

Assignment of Error Number One (verbatim): The court erred in finding there was no reasonable doubt as to the identification of the juvenile, R. G., in this case.
R.G. argues that reasonable doubt existed as to whether he committed the armed robbery. In support of this assertion, R.G. cites the lack of physical evidence, including the fact that no fingerprints were found on the bicycle or the gun. R.G. also points to the fact that Z.R. refused to identify his accomplice at first, leading police to assume that the accomplice. must have been a family member, when R.G. is unrelated to Z.R. R.G. also asserts that the photographic lineup display was unduly suggestive because none of the other photographs physically resembled the description of the second robber given by the victims on the night of the robbery. R.G. also complains that Graham was the only victim to view the photographic lineup, while Evans never saw it at all. Finally, R.G. posits that he was “set up” by Z.R. because the two young men had not gotten along in the past.
The State contends that the evidence was sufficient because Graham was able to positively identify R.G. in the photographic lineup prior to trial and because both Evans and Graham positively identified R.G. as one of the robbers in the courtroom during trial. The State further argues that the lineup was not unduly suggestive and that the totality of the circumstances did not present a likelihood of misidentifi-cation or an unreliable identification by the witness. The State also asserts that, even had R.G. |9been able to show suggestiveness of the photographic lineup, he was able to cure the issue through eross-exami- *62 nation of the witnesses at trial. Finally, the State contends that Z.R.’s identification of R.G. as his accomplice, standing alone, is sufficient evidence to support the identification of R.G. as one of the perpetrators.
In order to adjudicate a child delinquent, the State must prove beyond a reasonable doubt that the child committed the delinquent act alleged in the petition. See La. Ch. C. art. 883. In a juvenile case, the reviewing court is constitutionally compelled to review both facts and law. La. Const. Art. 5, § 10(A) & (B). The reviewing court, however, must also recognize the fact that the juvenile court observed the conduct and demeanor of the witnesses and was in the best position to assess credibility and weigh the evidence. State ex rel. K.M.T., 44,731 (La.App.2d Cir.8/19/09), 18 So.3d 183. Thus, not only does Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), apply to delinquency adjudication hearings, but our state constitution also requires that the reviewing court determine, after reviewing the record evidence, whether the juvenile court was clearly wrong in its factual findings. Id.
The standard of review for a sufficiency of the evidence claim is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson, supra; State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/5/03), 852 So.2d 1020.
When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. State v. Jacobs, 504 So.2d 817 (La.1987). When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational finder of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Id.; State v. Adkins, 39,724 (La.App.2d Cir.6/29/05), 907 So.2d 232, writ denied, 06-2514 (La.5/4/07), 956 So.2d 607; State v. Lott, 535 So.2d 963 (La.App. 2d Cir.1988).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App.2d Cir.5/9/07), 956 So.2d 769; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 06-1083 (La.11/9/06), 941 So.2d 35. Such testimony alone is sufficient even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense by the defendant. State v. Robinson, 36,147 (La.App.2d Cir.12/11/02), 833 So.2d 1207; State v. Ponsell, 33,543 (La.App.2d Cir.8/23/00), 766 So.2d 678, writ denied, 00-2726 (La.10/12/01), 799 So.2d 490; see also State v. Johnson, 96-0950 (La.App. 4th Cir.8/20/97), 706 So.2d 468, writ denied, 98-0617 (La.7/2/98), 724 So.2d 203, cert. denied, 525 U.S. 1152, 119 S.Ct. 1054, 143 L.Ed.2d 60 (1999).
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a fact finder’s decision to accept or reject the testimony of a witness in whole or in part. *63 State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
In cases involving a defendant’s claim that he was not the person who committed the crime, the Jackson rationale requires the State to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Hughes, 05-0992 (La.11/29/06), 943 So.2d 1047; State v. Powell, 27,959 (La.App.2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520.
A defendant attempting to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misiden-tification as a result of the identification procedure. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Prudholm, 446 So.2d 729 (La.1984); State v. Chaney, 423 So.2d 1092 (La.1982). The Manson court listed five factors used to determine whether an identification procedure was suggestive: (1) the witness’s opportunity to view the defendant at the time the crime was committed; (2) the degree of attention paid by the witness during the commission of the crime; (3) the Inaccuracy of any prior description; (4) the level of the witness’s certainty displayed at the time of the identification; and (5) the length of time elapsed between the crime and the identification. Manson v. Brathwaite, supra.
R.G. claims that the trial judge erred in finding that there was no reasonable doubt as to the identification of R.G. as one of the robbers. We disagree. Z.R. identified R.G. as his accomplice after Z.R. had been tried and adjudicated delinquent of the armed robbery. Both victims, Graham and Evans, positively identified R.G. in the courtroom during trial. Graham further testified that he recognized R.G. approximately a month after the robbery, walking near Hollywood and Hearne Avenues in Shreveport.
Graham positively identified R.G. in a photographic lineup which took place on August 27, 2009, approximately two months after the robbery. A review of the photographic lineup array does not demonstrate suggestiveness. The individuals in the photographs appear to be similar in weight and height and have similar complexions, haircuts and facial hair. Additionally, Graham testified that Officer Ross explained that the photographs could be outdated, did not suggest one picture over another and did not tell him that he had information linking R.G. to the crime.
Graham also testified that, because the street and parking lot were well lit, he got a very good look at the robbers when they walked past LSU Medical Center. He further testified that he kept his eye on them prior to the robbery. On cross-examination, Graham stated that he did not remember every detail of R.G.’s appearance, but that he remembered enough to know who he was. On the night of the robbery, he gave police a detailed | ^description of both robbers. Graham also testified that he saw R.G. on the street just prior to the lineup and that R.G. had laughed at him when the two made eye contact. Furthermore, when Graham positively identified R.G. at trial, he testified that R.G. was the person who had told him to “give me everything you got.” Given these facts, we do not find that there was any likelihood of misidenti-fication. Graham’s testimony alone is sufficient to prove the commission of the offense by R.G. State v. Robinson, supra.
Additionally, although Evans’ positive identification of R.G. in the courtroom at trial came almost seven months after the robbery, Evans testified that the robbers *64 walked right past him and Graham before getting to the overpass and that he “vividly remembered” who had robbed him. When questioned as to his certainty that he correctly identified R.G. as one of the robbers, he testified that he was “100 percent sure that’s him.” He also gave police a detailed description of the robbers on the night of the robbery. Accordingly, we find that sufficient evidence exists to support the identification of R.G. as one of the robbers.
This assignment of error is without merit.
Assignment of Error Number Two (verbatim): The court’s errors on evidentiary rulings require a de novo review from which this court should determine there is reasonable doubt as to the identity of the perpetrator.
R.G. contends that the trial judge erred when he sustained the State’s objection to defense counsel asking if Graham had ever been adjudicated delinquent of a DWI offense. R.G. claims that the question was properly used to attack Graham’s credibility because, when asked whether he was drinking on the night of the robbery, he stated that he never drank. R.G. I^also avers that the trial judge erred in allowing hearsay testimony from Officer Ross that he received information from the prosecutor’s office identifying R.G. as one of the robbers. R.G. claims that the State should have called Z.R. to testify to elicit the information for trial purposes. R.G. concludes that, because the State had planned to call Z.R. but never did, a presumption should arise that his testimony would have been adverse to the State’s case.
The State counters that Graham did not testify that he never consumed alcohol; rather, he testified that he did not consume alcohol three to four hours prior to the robbery and that he did not do drugs. According to the State, therefore, any reference to a DWI is irrelevant.[4] The State also contends that' Z.R.’s out-of-court statement was not a confession for purposes of the hearsay exception because it was not given to a law enforcement officer. Additionally, even if the statement implicating R.G. was considered a confession and, therefore, admissible, its exclusion is subject to the harmless error rule and, thus, does not require a reversal of the adjudication. We agree.
La. C.E. art. 609.1 allows for the admission of past convictions at a criminal trial for every witness for the purpose of attacking that witness’s credibility. See La. C.E. art. 609.1. Ordinarily, only the fact of the conviction, the name of the offense, the date thereof and the sentence | ^imposed are admissible. See La. C.E. art. 609.1(C). Details of the conviction, however, may become admissible if: (1) the witness has denied the conviction or denied recollection thereof; (2) the witness has testified to exculpatory facts or circumstances surrounding the conviction; or (3) the probative value thereof outweighs the danger of unfair prejudice, confusion of the issues or misleading the jury. Id.
A trial court is afforded great discretion in controlling the scope and extent of cross-examination and its findings will not be disturbed absent a finding of an abuse of discretion. State v. Coleman, 32,906 (La.App.2d Cir.4/5/00), 756 So.2d *65 1218, writ denied, 00-1572 (La.3/23/01), 787 So.2d 1010. Furthermore, any failure on the part of the trial judge to allow cross-examination pursuant to La. C.E. art. 609.1(C), thus resulting in an infringement on a defendant’s right of confrontation, is subject to the harmless error analysis. Id.; State v. Butler, 30,798 (La.App.2d 6/24/98), 714 So.2d 877, writ denied, 98-2217 (La.1/8/99), 734 So.2d 1222.
The testimony of a police officer may encompass information provided by another individual without constituting hearsay if it was offered to explain the course of the investigation and the steps leading to the defendant’s arrest. State v. Smith, 98-1417 (La.6/29/01), 793 So.2d 1199, cert. denied, 535 U.S. 937, 122 S.Ct. 1317, 152 L.Ed.2d 226 (2002). Additionally, a defendant is required under La. C. Cr. P. art. 841 to make a. contemporaneous objection to the hearsay testimony at trial in order to preserve the claim on appeal.
|1fiWe find that the trial judge did not err when he sustained the State’s objection to R.G.’s question to Graham regarding a previous DWI conviction. R.G.’s reference to the alleged past conviction was not proper to attack Graham’s credibility, as required by La. C.E. 609.1. Graham did not testify that he never drinks alcohol — he stated that he had not consumed alcohol in the three to four hours prior to the robbery and that he did not consume drugs. An alleged DWI conviction, therefore, would have no relevance to Graham’s statement that he did not consume alcohol during the three to four hours prior to the robbery.
Further, we find that the trial court did not err in permitting Officer Ross to testify with regard to the communications that he received from the prosecutor’s office pertaining to the potential identity of the other robber. The testimony was elicited by the State to explain Officer Ross’s investigation and his reason for the photographic lineup. His testimony regarding those communications was, therefore, not impermissible hearsay because the testimony was offered to explain the course of the investigation and the steps leading to R.G.’s arrest. Id. Additionally, R.G. failed to contemporaneously object when Officer Ross was questioned on direct examination with regard to the communications; and, consequently, R.G. is barred from raising the issue on appeal. See La. C. Cr. P. art. 841.
This assignment of error is without merit.

CONCLUSION

For the foregoing reasons, the adjudications of delinquency and sentence of the juvenile defendant, R.G., are affirmed.
AFFIRMED.

. Z.R. did not implicate R.G. as the other perpetrator of the robbery until after he had been tried and adjudicated delinquent of the robbery charges in a separate hearing.

. Officer Ross testified that he was never able to get in touch with the other victim, Evans, for the purposes of having him view the photographic lineup.

.The lineup contained six color photographs. Officer Ross explained that, when constructing a photographic lineup, he takes a photograph of the suspect and places it in an array with five other randomly selected photographs of similar-looking people.

. The State further maintains that the court minutes proffered by R.G. are for a different individual with the same name as the victim, Arthur Graham. The State cites the fact that the conviction for the DWI was in 1998, when the victim Arthur Graham would have been only II or 12 years old. In furtherance of this argument, the State notes that the court minutes were of a district court proceeding, and not a juvenile court hearing, where an 11-year-old or 12-year-old would have been adjudicated delinquent for a DWI offense.