PITMAN, J.
h This criminal appeal arises from a judgment of the First Judicial District Court, Caddo Parish, Louisiana, the Honorable Scott J. Crichton presiding. A unanimous jury found Defendant, Dion Lewis, guilty of second degree murder for the August 26, 2009 home invasion/robbery and killing of Kevin Earl Edwards (“Edwards”). Defendant was sentenced to life imprisonment without the benefit of probation, parole or suspension of sentence. For the following reasons, Defendant’s conviction and sentence are affirmed.
FACTS
On August 26, 2009, Defendant and two other men entered the home of Antonia Wesley (“Wesley”) in Shreveport, Louisiana. Defendant and one other of the intruders were armed; they immediately began searching the house and demanding money from Wesley. Edwards was sleeping in one of the bedrooms of the Wesley home when he was awakened by the intruders and fatally shot twice in the torso. Though Defendant and the other intruders rifled through drawers and repeatedly asked Wesley where the money was, there is no conclusive evidence that anything was missing from the house after the incident.
The Shreveport Police Department (“SPD”) investigated the scene and the forensic evidence gathered, including a bullet casing, a skull cap and part of a latex glove, was tested. It was determined that Edwards was shot with a .45 caliber weapon. Defendant’s DNA was found in the latex glove finger and on the skull cap that were recovered from the bedroom in which Edwards was shot.
Shortly after Edwards’ death, SPD was investigating the death of 12Shannon Gol-ston, a very close friend of Defendant. Investigators found a .45 caliber firearm in Golston’s residence that matched the rifling characteristics of the casings found at the scene of Edwards’ murder.
A few weeks after the home-invasion, Wesley received a phone call from Waco Collins, a known criminal in the Shreveport area, who offered her information about who was involved in the home invasion/robbery that led to Edwards’ death. Mr. Collins provided Wesley with three names that he knew to be the men who were in her house on August 26, 2009— Shannon Golston, Gerald Needham and Defendant. Wesley passed this information on to the SPD detectives investigating the crime. Both Wesley and her older son, D’Schwadraa, identified Defendant as the shooter in the photographic lineup that was administered by the SPD.
On June 17, 2010, Defendant was arrested and charged by bill of information for the first-degree murder of Edwards. The bill of information was later amended to the charge of second degree murder. During trial, defense counsel filed a motion to suppress identification testimony alleging that the photographic lineup used to identify Defendant as the suspect was unnecessarily suggestive. At the suppression hearing, the trial court denied the motion.
On April 23, 2012, the jury found Defendant guilty of second degree murder. De *649 fense counsel filed a motion for post-verdict judgment of acquittal, arguing that the evidence presented by the State failed to prove beyond a reasonable doubt that Defendant committed the murder of Edwards. That motion was denied. Defense counsel also filed a motion for new trial, arguing that prejudicial hearsay testimony was admitted into trial. That motion was also Isdenied. That same day, Defendant waived the sentencing delays and the sentencing hearing was held. After reviewing Defendant’s criminal history, which included four felony convictions and four other felony arrests, the trial court sentenced Defendant to life imprisonment without the benefit of probation, parole or suspension of sentence. Defendant now appeals.
DISCUSSION

Assignment of Error 1: Sufficiency of the Evidence

Defendant contends that the evidence presented at trial was insufficient to link him to the crime, arguing that it was merely inconsistent and unreliable eyewitness identification, as well as DNA evidence taken from the ripped finger of a latex glove.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to ^accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 06-1083 (La.11/9/06), 941 So.2d 35. The trier of fact is charged to make a credibility evaluation and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Sosa, 05-0213 (La.1/19/06), 921 So.2d 94.
Viewed in a light most favorable to the prosecution, the evidence presented at trial was sufficient for the jury to find Defendant guilty of the second degree murder of Edwards. In order to convict Defendant of second degree murder, the jury had to *650 conclude that he had the specific intent to kill or inflict great bodily harm, or that he was engaged in the perpetration or 1 ¿attempted perpetration of an enumerated felony, such as aggravated burglary, armed robbery or simple robbery. La. R.S. 14:30.1.
At trial, the State presented the eyewitness testimony of Wesley and her two sons, D’Schwadraa and D’Artre-yus, who all testified as to the same basic sequence of events that occurred on the night of the crime. At approximately 1:00 a.m., when Wesley returned home from work, three suspects followed her inside. She screamed and ran into her older son’s bedroom, where Defendant got on top of her on the bed and demanded money. She took Defendant to the bedroom where Edwards was sleeping and a scuffle between Edwards and Defendant followed. Defendant fired multiple gunshots, striking Edwards. Thereafter, the men searched the dresser drawers and fled. Wesley and D’Schwadraa identified Defendant in a photographic lineup and at trial.
The evidence presented at trial established that Defendant’s DNA was found at the crime scene in the bedroom where Edwards was shot. A latex glove finger and a black skull cap were found on a bloodstained area of the bedroom floor, between the bed and the wall, in the area where the victim’s body was located. Defendant’s DNA was found on the inside of the latex glove finger. The witnesses’ testimony established that the perpetrator was wearing gloves. Further, the black skull cap contained the DNA of Defendant and the blood of Edwards.
In addition, the evidence connected Defendant to the revolver that killed Edwards. The revolver found at the scene of Shannon Golston’s homicide, when tested, created markings that matched the two bullets that ultimately killed Edwards. At the Golston crime scene, Det. Rudell, the same SPD detective investigating the Edwards murder, found photographs that showed 1 r,Golston and Defendant together, and Defendant told Det. Rudell that Gol-ston was “his boy” and that he “loved him to death,” establishing their close friendship. Moreover, Det. Rudell’s description of Golston as a short, stocky, muscularly built black man matches the witnesses’ description of the second perpetrator.
The State presented sufficient evidence for the jury to reasonably find that Defendant had the specific intent to kill or inflict great bodily harm. Edwards died from two gunshot wounds to his back, fired from a very close range. Edwards’ body was pressed against something, presumably the floor or the bed, when he was shot. The revolver had a double action pull of 12 1/5 pounds, which is somewhat difficult to pull. Wesley testified that, after she heard the first gunshot, she went to the bathroom doorway and saw Defendant stand over Edwards and shoot two more times. Also, Wesley testified that Defendant had a gun and threatened to kill them if they did not give him the money.
Further, the State presented sufficient evidence for the jury to reasonably find that Defendant was engaged in the perpetration or the attempted perpetration of an aggravated burglary, armed robbery, or simple robbery. Defendant was armed with a gun when he made an unauthorized entry into an inhabited dwelling, Wesley’s home. Wesley, D’Schwadraa and D’Artre-yus testified that the men repeatedly asked where the money was located and that they rummaged through the dresser drawers. This evidences Defendant’s intent to commit a theft. Also, there was testimony presented that Wesley’s cell phone and Edwards’ wallet were missing from the house after the incident, even *651 though none of the witnesses saw the men leave the house with anything. [ 7However, even if the jury could not conclude that a completed aggravated burglary or armed robbery had occurred, the evidence was sufficient to support a finding that he attempted either of these crimes.
Therefore, the evidence presented was sufficient to support Defendant’s conviction for second degree murder, either by the specific intent to kill or inflict great bodily harm, or by the attempted perpetration of an aggravated burglary or an armed robbery.

Assignment of Error 2: Failure to Suppress Identification Testimony

Defendant argues that the photographic lineup that was presented to Wesley and her son D’Schwadraa was unduly suggestive because the white shirt that Defendant is wearing and the cropping of the photograph immediately draws the eye to Defendant. Defendant also suggests that there is a significant likelihood of misidentification as a result of the photographic lineup because the witnesses were not able to view the suspects during the crime due to low lighting and handkerchiefs that were worn over the suspects’ faces. Further, Defendant argues that it is clear that Wesley was traumatized during and after the incident, as she was unable to speak to the 911 operator; therefore, her recollection of the events must have been compromised. Defendant also cites the inconsistent statements and descriptions of the eyewitnesses as a reason to dismiss the identification testimony. Immediately after the shooting, Wesley told SPD detectives that she was not able to get a good look at any of the intruders; however, at trial, she testified that she was able to recognize Defendant because she had seen his eyes when she was pushed down onto the bed and he was straddling her, holding her down. The photograph included in jsthe lineup has a partial shadow over Defendant’s left eye, which Defendant argues allows for a possibility of error.
The photographic lineup was generated using a computer system, which eliminates the possibility of tampering or making the lineup unduly suggestive. It was shown to the witnesses separately and neither Wesley nor her son was shown a picture of Defendant prior to the photographic lineup.
In seeking to suppress an identification, a defendant must prove the procedure used was suggestive and that the totality of the circumstances presented a substantial likelihood of misidentification. State v. Martin, 595 So.2d 592 (La.1992); State v. West, 561 So.2d 808 (La.App. 2d Cir.1990), writ denied, 566 So.2d 983 (1990). The U.S. Supreme Court has approved several factors for evaluating whether the reliability of an identification may outweigh the suggestiveness of the procedures employed. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); State v. Davis, 27,961 (La.App.2d Cir.4/8/96), 672 So.2d 428, writ denied, 97-0383 (La.10/31/97), 703 So.2d 12. The factors are: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness’s degree of attention, (3) the accuracy of the victim’s prior description of the criminal, (4) the level of certainty demonstrated at the confrontation and (5) the length of time between the crime and the confrontation.
Photographs used in a lineup are suggestive if they display a defendant so singularly that the witness’s attention is unduly focused on the defendant. State v. Smith, 430 So.2d 31 (La.1983). It is not required that each person whose *652 ^photograph is used in the lineup have the exact physical characteristics as the defendant. What is required is sufficient resemblance to reasonably test identification. State v. Smith, supra; State v. Davis, supra.
Even if suggestiveness is proven by a defendant, it is the likelihood of mis-identification, and not the mere existence of suggestiveness, which violates due process. State v. Williams, 375 So.2d 364 (La.1979); State v. Davis, supra.
The photographic lineup used in this case was not unduly suggestive. The only distinguishing feature of Defendant in the lineup is that his photograph was taken from a farther distance than the others and he is wearing a white t-shirt. However, a review of the photographic lineup does not show that this focuses attention upon Defendant so as to make the lineup unduly suggestive. All of the men contained in the lineup are of similar height, weight and age and have similar facial hair and facial features. All of the photographs have a similar background and all of the men are wearing various forms of casual street clothing. Neither of the witnesses had seen a photograph of Defendant prior to viewing the lineup. There is nothing in the record to indicate that, in making their identification, the witnesses focused on the clothing worn by Defendant, rather than his overall physical appearance. The photographic lineup, therefore, does not unduly focus attention on Defendant.
In addition, the record does not indicate that the use of this photographic lineup was tainted by the likelihood of misidentification. At the time of the crime, the house was dark and the only light came from a stove light in the kitchen and TVs in the bedrooms. Defendant was wearing a bandana that | incovered the bottom half of his face. The witnesses, however, were able to view Defendant, specifically his eyes, while they were in close proximity to him. Wesley was able to view Defendant when he was face-to-face with her on top of her bed, and D’Schwad-raa was able to view Defendant when Defendant stood over him in the hallway. During the crime, the witnesses appear to have been paying attention to what the men were doing, as shown by the fact that D’Schwadraa kept coming out of his room to see what was happening. Although some of their descriptions of the perpetrators were inaccurate, such as the number of men and the fact that Defendant’s arms are covered in tattoos, their general descriptions of the men were accurate and consistent. Further, while there was conflicting testimony about the manner in which the witnesses viewed the lineup, Wesley and D’Schwadraa were positive in their identifications of Defendant when they viewed the lineup, two months after the crime, and at trial. Considering the totality of these circumstances, there was no substantial likelihood of misidentification. Therefore, the photographic lineup used in this case was not suggestive and the identifications made by the witnesses were sufficiently reliable. This assignment of error, therefore, is without merit.

Assignment of Error 3: Denial of Defendant’s Motion for New Trial; Denial of Defendant’s right to confrontation; and Admission of Hearsay Evidence over defense counsel’s objection.

Defendant contends that the trial court erred in denying his motion for new trial in that hearsay testimony was introduced during the trial over defense objection. The defense objected when Wesley testified that she gave Det. Rudell the names given to her by Waco Collins. The assistant district attorney Instated that he would not go into any actual discussions Wesley had with Mr. Collins, just the in *653 formation she passed on to detectives. The trial court overruled the objection. As the questioning continued, trial counsel renewed the hearsay objection, arguing that any names Wesley was given are hearsay. Again, the trial court overruled the objection.
Defendant now argues that Wesley’s testimony was inadmissible hearsay and should not have been presented to the jury. Defendant claims that this information was prejudicial to him because it represented the initial connection of him to this case and impacted his right to confront witnesses against him to his detriment.
In his pro se brief, Defendant reiterates his attorney’s argument almost verbatim. However, in addition, Defendant claims that, although the trial court recognized that Wesley’s statements were testimonial in nature, it held that the statements were subject to the harmless error standard and denied him relief. Defendant contends that neither the Louisiana Supreme Court nor the United States Supreme Court has addressed the issue of whether the harmless error standard applies to this type of constitutional error. Thus, Defendant argues that Wesley’s testimony was inadmissible and prejudiced his defense.
La. C. Cr. P. art. 851 provides that the court shall grant a motion for a new trial whenever the verdict is contrary to the law and the evidence or the trial court’s ruling on a motion or objection shows prejudicial error. The denial of a motion for new trial is not subject to appellate review, except for error of law. La. C. Cr. P. art. 858; State v. Jones, 41,672 (La.App.2d Cir.1/14/09), 999 So.2d 1156. The decision to grant or deny a new trial rests in the sound discretion of the trial court. State v. Brisban, 00-3437 (La.2/26/02), 809 So.2d 923. Generally, a motion for new trial will be denied unless the defendant establishes that he has suffered some injustice. La. C. Cr. P. art. 851; State v. Jones, supra.
Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. arts. 801(A)(1), 801(C). Hearsay evidence is not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802. Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter, who is not subject to cross-examination and other safeguards of reliability. State v. Martin, 458 So.2d 454 (La.1984). However, if a statement is not introduced to prove the truth of the matter asserted, then that statement, by definition, is not hearsay. State v. Tate, 25,765 (La.App.2d Cir.2/23/94), 632 So.2d 1213, writ denied, 94-1218 (La.8/23/96), 678 So.2d 33.
A witness is generally competent to testify that a statement was made to him so long as no attempt is made to vouch for the credibility of its contents. State v. Watson, 449 So.2d 1321 (La.1984). Also, when an investigating officer testifies concerning events leading to the arrest of a defendant, the statements made to him by others during the course of the investigation are not hearsay if they are not offered for the truth of the matter asserted, but merely to explain the officer’s actions. State v. Wille, 559 So.2d 1321 (La.1990), cert. denied; State v. R.G., 49 So.3d 56 (La.App.2d Cir.9/22/10); State v. Grant, 954 So.2d 823 (La.App.2d Cir.4/4/07). When the officer does not testify with regard to the substance of what another person told him, but -with regard to what he did in response to that information, the testimony is not considered hear *654 say. Information received by a police officer can have both hearsay and nonhearsay elements. When admissibility is questioned, the court should balance the need of the evidence for the proper purpose against the danger of improper use of evidence by the jury. State v. Wille, supra.
The erroneous admission of hearsay evidence does not require reversal of the conviction when the error is harmless beyond a reasonable doubt. State v. Grant, supra. Rather, reversal is mandated only when there is a reasonable possibility that the hearsay evidence might have contributed to the verdict. Id. The Louisiana Supreme Court has long held that the admission of hearsay testimony is harmless error where the effect is merely cumulative or corroborative of other testimony adduced at trial. State v. Johnson, 389 So.2d 1302 (La.1980); State v. McIntyre, 381 So.2d 408, 411 (La.1980), cert. denied., 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 90 (1980).
Wesley’s testimony regarding the names of potential suspects that she received from Waco Collins and then relayed to Det. Rudell is inadmissible hearsay. The statements represented the initial connection of Defendant to this case, and Mr. Collins did not testify at trial. This testimony may have been offered to prove the truth of the assertion that Defendant committed this crime. Further, after defense counsel objected, the assistant district attorney rephrased 114his questions to elicit testimony only of the names of potential suspects that Wesley gave to Det. Rudell and not the actual discussions that she had with Mr. Collins.
With aspects of Wesley’s statements clearly hearsay, the trial court erred in admitting them; however, they are subject to the harmless error standard. The jury was presented with substantial evidence to convict Defendant, even without consideration of the questioned testimony, as discussed above. Further, on cross-examination, defense counsel elicited the same testimony from Wesley when he questioned her about whether she received the three names from Mr. Collins and how Mr. Collins obtained that information. In addition, Det. Rudell testified as to the names of the three suspects, including Defendant, and that Wesley had given him names of potential suspects. Considering the totality of the evidence presented and the fact that the names given to Wesley were admitted in other lines of questioning, the admission of the hearsay statements was harmless error.

Assignment of Error k: Excessive Sentence

Defendant argues that the evidence presented did not prove who shot Edwards or negate the possibility that Edwards may have pulled the trigger himself during a struggle with the perpetrators. Thus, Defendant contends that, under these circumstances, Defendant’s life sentence at hard labor is excessive and unjustified.
The mandatory sentence for second degree murder is punishment by life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence. La. R.S. 14:30.1(B). The argument that the mandatory 11filife sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Parker, 416 So.2d 545 (La.1982); State v. Brooks, 350 So.2d 1174 (La.1977); State v. Roberson, 40,809 (La.App.2d Cir.4/19/06), 929 So.2d 789. The decision to assess mandatory life sentences for certain felonies is within the prerogative of the legislature. State v. Parker, supra.
In State v. Dorthey, 623 So.2d 1276 (La.1993), and State v. Johnson, 97-1906 *655 (La.3/4/98), 709 So.2d 672, the supreme court addressed the issue of mandatory sentences in the context of the habitual offender law. The court held that a downward departure from a mandatory minimum sentence may occur in rare circumstances if the defendant rebuts the presumption of constitutionality by showing clear and convincing evidence that he is exceptional, namely, that he is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender and the circumstances of the ease. This rule has been extended to mandatory sentences beyond habitual offender cases. See State v. Fobbs, 99-1024 (La.9/24/99), 744 So.2d 1274; State v. Chandler, 41,063 (La.App.2d Cir.9/8/06), 939 So.2d 574, writ denied, 2006-2554 (La.5/11/07), 955 So.2d 1277. However, the “rare circumstances” described by Johnson, supra, in which a mandated sentence can be altered are even less likely in the case of a life sentence chosen by the legislature for a single crime, such as aggravated rape or second degree murder. State v. Chandler, supra. In such crimes, 11fiunlike the mandatory minimum sentence under the habitual offender law, the “tailoring” of the sentence by the legislature was for life because the culpability of offenders and the gravity of the offense are so great. Id.
Defendant was convicted of second degree murder and the trial court sentenced him to life imprisonment without the benefit of parole, probation or suspension of sentence, as required by La. R.S. 14:30.1(B).
Defendant failed to demonstrate that he is the “exceptional” defendant for which a downward departure from the statutory minimum sentence is required. The jury obviously accepted the overwhelming evidence against Defendant, and he was accordingly convicted of second degree murder. In addition, prior to imposing Defendant’s sentence, the trial court reviewed Defendant’s criminal history, including four felony convictions and four other felony arrests. When compared to the severity of the offense, the imposed sentence is neither grossly disproportionate nor shocking to the sense of justice. Therefore, the trial court did not err in imposing the mandatory sentence of life imprisonment. This assignment of error is without merit.

Assignment of Error 5: The DNA evidence was admitted without determining that it meets the appropriate standard of scientific reliability.

In the pro se brief submitted to this court, Defendant contends that the trial court should have conducted a DNA hearing prior to trial. Defendant claims that the trial court must determine whether the overall methodology used while conducting a DNA test satisfies the requirements in Daubert and whether each step in the methodology was performed properly. The DNA |17evidence linking Defendant to this crime was from a ripped finger of a latex glove. Defendant argues that, since the trial court failed to conduct a hearing to establish the appropriate testing methodology, he was limited to cross-examination of the State’s witness, Cassandra Hernandez, regarding the appropriate methodology for relating blood and cell samples to individuals.
In State v. Charles, 602 So.2d 15 (La.App. 3d Cir.1992), writ granted in part and amended, 607 So.2d 566 (La.1992), the court recognized the extremely prejudicial effect of DNA testing and held that a defendant is entitled to a pretrial hearing on the admissibility of DNA test results, if such a hearing is requested. The burden of proving the admissibility of the DNA test results rests with the state. State v. Charles, 617 So.2d 895 (La.1993); State v. *656 Spencer, 95-208 (La.App. 3d Cir.10/4/95), 663 So.2d 271.
The defense never requested a pretrial hearing to determine the admissibility of the DNA evidence. At a pretrial hearing on April 17, 2012, defense counsel acknowledged that he had met with the DNA expert and that there had been full compliance with his discovery requests for DNA test results.
Prior to being qualified by the court as an expert in forensic DNA analysis, Cassandra Hernandez was questioned by the assistant district attorney and defense counsel regarding her qualifications and experience in DNA analysis. Also, Ms. Hernandez’s curriculum vitae was presented into evidence. Defense counsel made no objection to Ms. Hernandez’s testimony. Therefore, since the defense had full knowledge of the DNA evidence and did not object to the admission of the DNA test results prior to trial, this | ^assignment of error is without merit.
CONCLUSION
For the foregoing reasons, the conviction and sentence of Defendant, Dion Lewis, are affirmed.
AFFIRMED.