# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 19-30018

United States Court of Appeals
Fifth Circuit

**FILED**
November 3, 2020

Lyle W. Cayce
Clerk

JUSTIN TERRELL ATKINS,

>     Petitioner - Appellant

v.

TIMOTHY HOOPER, Warden, Elayn Hunt Correctional Center,

>     Respondent - Appellee

Appeal from the United States District Court
for the Western District of Louisiana

ON PETITION FOR REHEARING

Before SOUTHWICK, COSTA, and DUNCAN, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

The previous opinion is withdrawn. *See Atkins v. Hooper*, 969 F.3d 200 (5th Cir. 2020). A Louisiana inmate appeals the district court's denial of *habeas* relief based on a Confrontation Clause violation. We AFFIRM.

## FACTS AND PROCEDURAL BACKGROUND

A jury convicted Justin Terrell Atkins of armed robbery and aggravated battery. The conviction was affirmed on appeal, then the Louisiana Supreme Court denied review. *State v. Atkins*, 74 So. 3d 238 (La. Ct. App. 2011), *writ denied*, 82 So. 3d 284 (La. 2012) (mem.). Our factual summary is taken from

the Louisiana court of appeal decision. *Id.* at 239. The issue in this appeal concerns the evidence identifying Atkins. For purposes of describing the events, we assume Atkins was one of the participants.

Robert Jones, Howard Bishop, and Tom Harris were drinking alcohol together at Jones's house. Atkins knew that Bishop and Jones had just returned to the house after Jones cashed a check. After kicking in the door to the house, Atkins demanded money, but Jones refused. Atkins began beating Jones with the butt of a firearm. When Harris intervened, Atkins hit him too. Bishop witnessed the incident and saw Atkins take money from Jones's pocket. During the robbery, Lawrence Horton was at the door to Jones's house. Horton had followed Jones and Bishop and saw Jones cash his check.

That night, neither Bishop nor Harris could give the actual names of the men involved in the crime. They were able to inform police, though, of their nicknames and added that the person who hit Harris and Jones had been wearing an orange shirt. Harris within a few days learned Horton's name and informed police. Eight days after the crime, Horton surrendered himself to police. When questioned by Detective Jeffrey Dowdy, Horton admitted to being one of the offenders but said Atkins was primarily responsible for the crime. Detective Dowdy then obtained an arrest warrant for Atkins. Horton's statements were the first ones to name Atkins and the only ones Detective Dowdy used when obtaining an arrest warrant.

It was almost two weeks after the incident before either Bishop or Harris named Atkins. By that time, Atkins had already been arrested. Harris testified that a neighbor who lived below his apartment provided Harris with a picture of a man holding the neighbor's baby. The man in the photograph was Atkins. Harris believed that this photograph was of the person involved in the crime who had been wearing an orange shirt. He provided it to police.

No. 19-30018

The officers then asked Bishop to examine a photographic lineup, and Bishop chose the picture of Atkins. Whether Harris had earlier shown the photograph to Bishop is disputed, as we will discuss. This testimony was presented at trial, and a jury convicted Atkins for his role in the crime. The conviction was affirmed on direct appeal.

Atkins filed for state post-conviction relief in which he contended that he was denied his right to confront and cross-examine Horton when hearsay evidence was presented at trial. The claim focuses on the State's opening statement, the testimony of Detective Dowdy, and the State's closing argument.

The prosecutor made these assertions in his opening statement:

> Finally, I believe the State will have the testimony of Lawrence Horton. Lawrence Horton is a co-defendant in this case. That he was arrested for this offense as well as the defendant in this case. I believe that he will tell you that he and the defendant met on the morning of January 2nd, 2009. That they went ultimately to 1710 Jackson Street wherein the defendant, Mr. Atkins over here, busted the door in at 1710 and robbed and beat the victims while he himself, Mr. Horton, served as a lookout. And I believe that will – you will anticipate that testimony as well.

Detective Dowdy at trial was allowed to imply, but not directly state, that Horton had told Dowdy that Atkins was his accomplice in the crime:

> Q. Okay. And did you in fact speak with Lawrence Horton?
>
> A. Yes, sir, I did.
>
> Q. All right. Was he advised of his rights?
>
> A. Yes, sir, he was.
>
> Q. And did he provide a statement to you?
>
> A. Yes, sir, he did.
>
> Q. Was the statement inculpatory? Did he –
>
> A. Yes, sir, it was.

3

No. 19-30018

Q. Okay.  Did he implicate anybody else?

A. Yes, sir, he did.

Q. Okay.  As a result of this – well, all right, he implicated someone else.  What did you do next with regard to your investigation?

A. Based on the – the information that he provided he was arrested and again, based on the information that he provided I was able to obtain a warrant.

Q. For whom?

A. Justin Atkins.

Harris and Bishop testified for the State, identifying Atkins but admitting to being intoxicated at the time of the robbery.  The State rested without calling Horton after indicating in its opening statement that he would testify.  The State's brief here, written by the assistant district attorney handling the trial, said that Horton was interviewed after the opening statement.  As a result, "the undersigned counsel felt Mr. Horton was not a credible witness and decided not to call Mr. Horton."

Atkins presented only one witness, Darrell Williams, whose testimony contradicted parts of Harris' and Bishop's recollections of details leading up to the assault and robbery.  Williams also testified that a man in an orange shirt had been outside Jones's house just before the attack on Harris and Jones, but he could not identify that man as Atkins.  During closing argument, the prosecutor stated that Detective Dowdy "interview[ed] Lawrence Horton, who [was] known as O and then obtain[ed] an arrest warrant for Justin Atkins, the defendant." Detective Dowdy's testimony and the State's effort to make certain by its argument that jurors understood the implications about what Horton really told Detective Dowdy are the facts underlying the claim before us. Atkins was convicted, and the judgment was affirmed on appeal.

4

No. 19-30018

The state district court denied Atkins' application for post-conviction relief. Both the state court of appeal and supreme court denied Atkins' writ applications. Atkins filed a federal *habeas* application, claiming that he was denied his Sixth Amendment right to confrontation. A magistrate judge recommended that Atkins' application be denied. The district court adopted the report, dismissed Atkins' application, and denied Atkins a Certificate of Appealability. Atkins timely appealed. This court granted Atkins the right to appeal his Confrontation Clause claim.

## DISCUSSION

Atkins contends the state court's decision denying his Sixth Amendment Confrontation Clause claim was contrary to and involved an unreasonable application of Supreme Court precedent. Atkins also argues the State waived any harmlessness argument and, regardless, the error was harmful. We first, though, consider whether the State waived a defense of procedural default.

## I.    *Waiver of defense of procedural default*

The federal district court strongly recommended that the State analyze whether Atkins' request for relief was barred by procedural default and asked the State to address this possible defense. The district court's urging may have been because procedural default was one of the grounds on which the Louisiana Supreme Court denied state *habeas* relief. *State ex rel. Atkins v. State*, 227 So. 3d 251, 251 (La. 2017). Nevertheless, the State failed to do so at the district court, and Atkins now contends the State waived procedural default because of this failure. In the State's response brief, the State did not attempt to raise procedural default as a defense, and the State did not respond to Atkins' waiver

argument. Thus, to bar *habeas* relief based on procedural default, we would have to raise and apply the defense *sua sponte*.

When considering whether we should identify and apply a procedural default in *habeas* review, we consider whether the applicant had notice that the appellate court might consider procedural default and had a reasonable opportunity to respond, and whether the government intentionally waived the possible default. *Smith v. Johnson*, 216 F.3d 521, 524 (5th Cir. 2000). Here, the district court identified a possible defense of procedural default and instructed the State to raise the defense if the State believed it applied. The State thereafter answered Atkins' *habeas* application and explicitly spurned the suggested defense, stating that "it appears [Atkins] has exhausted his state court remedies." That is enough to convince us not to consider the issue of whether Atkins' *habeas* application is procedurally defaulted.

## II.    *Violation of the Confrontation Clause*

We review a "district court's findings of fact for clear error and its conclusions of law *de novo*." *Dorsey v. Stephens*, 720 F.3d 309, 314 (5th Cir. 2013). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant *habeas* relief on a claim that a state court has adjudicated on the merits unless that adjudication resulted in a decision that was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## A.     The last reasoned decision

A component of our review under AEDPA is how a claim was resolved in the "last related state-court decision" that provides a "relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  If the last state-court decision for the Section 2254 applicant did not provide a relevant rationale for the claim, we "look through" that decision until we find one that does.  *Id.*  Only then can we consider whether the highest state court to decide the claim resolved it in a manner contrary to or by an unreasonable application of clearly established Supreme Court precedent.  *Id.*

Atkins' *habeas* application in the state district court included the same Confrontation Clause claim he now pursues in federal court, but Atkins' state application also included claims of ineffective assistance of trial counsel.  We have no ineffective-assistance-of-counsel claims before us.

Our search for a reasoned decision starts with the highest state-court decision on Atkins' *habeas* claims, that of the Louisiana Supreme Court in September 2017.  *State ex rel. Atkins v. State*, 227 So. 3d 251 (La. 2017).  The court denied relief to Atkins for two reasons.  First, it concluded that Atkins' claims were procedurally defaulted because he "failed to raise his claims in the proceedings leading to conviction," relying on Louisiana Code of Criminal Procedure article 930.4(B).  *Id.* at 251.  That is the procedural default that we do not inject into this appeal.  Second, the court held that Atkins "fail[ed] to satisfy his post-conviction burden of proof" under Louisiana Code of Criminal Procedure article 930.2.  *Id.*  Because Atkins was claiming more than a Confrontation Clause violation, and all claims had already been rejected by that court as procedurally defaulted, this brief reference to the burden of proof does not inform us whether the court was applying that defect to all the claims.  Therefore, the Louisiana Supreme Court did not give a decision that was

No. 19-30018

reasoned in AEDPA terms on the Confrontation Clause issue or on harmlessness. *See, e.g.*, *Jackson v. Johnson*, 194 F.3d 641, 651 (5th Cir. 1999). We therefore look through that decision.

The preceding state-court decision was rather concise, issued by the Louisiana Second Circuit Court of Appeal in March 2016:

> Applicant Justin Terrell Atkins seeks supervisory review of the trial court's denial of his uniform application for post-conviction relief and "Amended Brief in Support of Application for Petition for Post Conviction Relief." On the showing made, the writ is denied. La. C. Cr. P. art. 930.2; La. C.E. 801(C); *State v. Lewis*, 47,853 (La. App. 2d Cir. 2/27/13), 110 So. 3d 644, 653, *writ denied*, 2013-0672 (La. 10/25/13), 124 So. 3d 1092; *Woods v. Etherton*, __U.S.__, 136 S. Ct. 1149 (2016).

The brevity of this decision imperfectly follows a Louisiana Uniform Rule of the Court of Appeal. The Rule provides the following:

> A. [Description of when summary disposition is appropriate.]
>
> B. The court may dispose of a case by summary disposition with or without oral argument at any time after the case is docketed in the appellate court. . . .
>
> C. When a summary disposition is issued, it shall contain:
>
> (1) a statement describing the nature of the case and the dispositive issues without a discussion of the facts;
>
> (2) a citation to controlling precedent, if any; and
>
> (3) the judgment of the appellate court and a citation to one or more of the criteria under this rule which supports the judgment, e.g., "Affirmed in accordance with Uniform Court of Appeal Rule 2-16.2.A(1)."

LA. UNIF. R. COURT APP. 2-16.2.

Among other omissions, the court of appeal did not identify a dispositive issue. The State now argues that one dispositive issue was the harmlessness of any error; the state court's failure to identify any issue blunts the contention. Nonetheless, we are not the supervisors of a state court's compliance with its

8

own procedural rules: "federal *habeas corpus* relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). We still must find some violation of federal law in the court's judgment before granting any relief.

The court of appeal first cited Louisiana Code of Criminal Procedure article 930.2, as would the state supreme court, which places the burden of proof on the applicant for relief. The court next cited Louisiana Code of Evidence article 801(c), which defines hearsay. At most we can discern that the definition of hearsay was relevant, and Atkins had the burden of proof as to any relevant facts and, perhaps, did not carry that burden well.

The first of two court opinions cited was *State v. Lewis*, 110 So. 3d 644 (La. Ct. App. 2013). In *Lewis*, the defendant raised five issues on appeal. *Id.* at 649–55. The court of appeal in Atkins' case gave a pinpoint citation to the page of *Lewis* discussing the right to confrontation. *Id.* at 653. That page refers to testimony similar to what is at issue in our case and avers that a police officer's describing his investigation by restating what he was told is generally not hearsay. *Id.* Still, there is no holding on that page about whether the testimony in *Lewis* contained hearsay. *Id.* On the next page of the opinion, the *Lewis* court held that the police officer's testimony that strongly implied the defendant was the suspect was actually inadmissible hearsay, but the error was harmless because of other substantial evidence of guilt. *Id.* at 654.

The State insists on this appeal that the reference to *Lewis* constitutes a holding on the merits that the testimony in this case was at worst harmless error, even if there were a violation of the Confrontation Clause. Our problem with this position is three-fold. First, there had not been any argument about harmless error in Atkins' case. The briefing in the state district court did not address that possibility, and the district court's opinion did not discuss it. As to Atkins' appeal, the State never filed a brief, an absence consistent with

9

No. 19-30018

Uniform Rule of the Court of Appeal 2-16.2(B) that allows the court to enter a decision without responsive briefing.  The issue of harmless error, therefore, had not been part of the case.  Second, by not identifying any dispositive issue, the court of appeal did not itself indicate that it was relying on harmless error.  Finally, the cited page of *Lewis* did not refer to the harmlessness of an error.

In considering the State's new argument that the court of appeal held any error to be harmless, we have two considerations.  On the one hand, Congress, by adopting AEDPA, has established rules to prevent federal courts from unnecessarily overturning state-court resolution of post-conviction claims.  On the other hand, *habeas* itself is based on important liberty interests.  For us to conclude that the court of appeal decision we just described actually held that the introduction of the officer's testimony was harmless error would create a ruling that the state court did not clearly make.  Before giving the exceptional level of deference to a state-court holding that AEDPA requires, we need better support than exists here to conclude that the state court actually made that holding.  We thus find that the state court by referring to *Lewis* was deciding on some other basis, perhaps the same that the trial court had used —this testimony was not hearsay at all.

Finally, the court of appeal cited *Woods v. Etherton*, 136 S. Ct. 1149 (2016).  *Woods* dealt only with a claim of ineffective assistance of appellate counsel for failing to raise a Confrontation Clause argument on appeal.  *Id.* at 1151–53.  As an initial matter, the court of appeal opinion does not include a pinpoint citation to any portion of the opinion.  We consider the case's general holding, which was that the federal circuit court of appeals applied the incorrect standard of review under AEDPA.  *Id.* at 1152.  When analyzing ineffective-assistance-of-counsel claims under AEDPA, the Supreme Court

10

concluded that "doubly deferential" review is the appropriate standard. *Id.* at 1151 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

Atkins argues that the state court of appeal denied his Confrontation Clause claim by incorrectly applying this double deference. Actually, because *Woods* addresses ineffective assistance of counsel, we conclude that the better understanding is that the state court was using that precedent to deny the similar claim that Atkins brought in state court but is not before us. Accordingly, the state court of appeal's use of *Woods* is not relevant to the Confrontation Clause claim before us.

We conclude that the state court of appeal did not make an identifiable, reasoned decision as to the Confrontation Clause. At most, we could say that its citation to *Lewis* could be a ruling that this testimony was not hearsay at all. Because of our uncertainty, we look through that court's opinion and find the state district court's decision.

In February 2016, the state district court denied Atkins' application for post-conviction relief with far more explanation than either appellate court. The court held that Atkins' right to confrontation was not violated, reasoning that because Detective Dowdy's testimony did not reference the actual statements Horton made during Detective Dowdy's investigation, no hearsay was admitted. The court also found that Detective Dowdy's testimony was "used to explain the sequence of events leading to the arrest of [Atkins] from the viewpoint of the arresting officers," which is permissible under state law. Because the state court determined the relevant statements were not hearsay, there was no Confrontation Clause violation. There was no additional consideration at this point of any harmless effect.

The district court's decision that this testimony was not hearsay is the needed ruling that provides a rationale for Atkins' Confrontation Clause claim.

The state court of appeal may also share this rationale. Because we have concluded that no state court considered harmlessness, when we analyze that issue, there is no state-court decision to receive deference.

### B.    *Application of Supreme Court precedent*

The state court's determination that we now review was a legal one, namely, that the relevant testimony was not hearsay. Our review, then, is under Section 2254(d)(1) for whether the court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

The first standard, that the decision be "contrary to . . . clearly established Federal law," is met if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The second standard, that the state court made an "unreasonable application of clearly established federal law," is satisfied when that court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* These alternatives require more than a federal court's conclusion that the state court erred under clearly established Supreme Court authority. The federal court must also conclude the state court's error was "unreasonable." *Id.* at 411.

We restate the key components of the challenged testimony. Detective Dowdy was asked what he was told by Horton, who had admitted to being involved in the offense. The prosecutor prefaced his question by saying that Horton "implicated someone else," and then asked Detective Dowdy, "What did you do next with regard to your investigation?" The answer was that, based

on what Horton told him, Detective Dowdy obtained a warrant for the arrest of Justin Atkins. Jurors surely knew whom Horton implicated.

We now examine the state-court decision. We already explained that the state court of appeal *may* have decided that the testimony was not hearsay at all when it cited a page from *Lewis*, one of its own opinions. No United States Supreme Court authority was cited on the specific page of *Lewis* that the intermediate court referenced, and we find no Supreme Court authority about hearsay anywhere in the *Lewis* opinion. *See Lewis*, 110 So. 3d at 653.

The state district court's ruling is the reasoned state-court decision. Two fairly brief paragraphs are the entirety of the hearsay discussion. First, under a caption of "Law," the court made these general statements about hearsay:

> A defendant's confrontation right is only implicated when the out-of-court statement is used to prove the truth of the matter asserted. *Tennessee v. Street*, 471 U.S. 409, 414 (1985). According to *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), the United States Supreme Court held that a defendant's rights under the confrontation clause of the Sixth Amendment to the United States Constitution were violated by the introduction, at a joint criminal trial, of a nontestifying codefendant's confession which named and incriminated the defendant. "Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La. C.E. art. 801(c).

The next paragraph was captioned "Analysis." There, the court held that the challenged testimony was not hearsay:

> Mr. Atkins argues that he was referenced to in the testimony of Detective Dowdy, Mr. Bishop, Mr. Harris, and in the opening and closing statements of the State of Louisiana. However, Mr. Atkins' rights were not violated, as no references were made to the statements made by Mr. Horton and thus hearsay was not evident. Although Detective Dowdy did make statements in reference to the conversation between Atkins and Mr. Horton, this conversation was used to explain the sequence of events leading to the arrest of

the defendant from the viewpoint of the arresting officers. *State v. Calloway*, 324 So. 2d at 809. Thus, Mr. Atkins' claims in this respect are meritless.

We examine the two cited Supreme Court opinions. In *Street*, the Confrontation Clause issue arose from the fact that the confession of an accomplice who incriminated Street was introduced. Its admission was for the "nonhearsay purpose of rebutting [Street's] testimony that his own [later] confession was a coerced 'copy' of" the accomplice's confession." *Street*, 471 U.S. at 417. An instruction was given, informing jurors to consider the accomplice's confession only as rebuttal to Street's claim and not for the confession's truthfulness. *Id*. at 412. The Supreme Court upheld the conviction, concluding that admission of the entire statement with a limiting instruction was necessary and constitutional. *Id*. at 415, 417. "Had the prosecutor been denied the opportunity to present [the accomplice's] confession in rebuttal so as to enable the jury to make the relevant comparison, the jury would have been impeded in its task of evaluating the truth of respondent's testimony and handicapped in weighing the reliability of his confession." *Id*. at 415.

The other Supreme Court decision cited by the state district court involved a joint trial of two defendants; a witness stated that one of the two confessed to him that both had committed the offense. *Bruton*, 391 U.S. at 124. The trial court instructed jurors that they could consider that testimony only as to the defendant who made the statement; the Supreme Court held the risk was too great that jurors would be unable to restrict their use of the confession. *Id*. at 135–36. The Court reversed the conviction.

The district court in Atkins' *habeas* suit did not reveal how it was applying *Street* and *Bruton*. The State's brief in response to Atkins' application in the state district court contained an explanation of *Street* that was quoted in that court's opinion: "A defendant's confrontation right is only implicated

when the out-of-court statement is used to prove the truth of the matter asserted. *Tennessee v. Street*, 471 U.S. 409, 414 (1985)." The State did not otherwise refer to *Street*. To support its substantive analysis, the brief cited *Calloway*, the same precedent the state district court then relied on to dismiss Atkins' claim. The *Calloway* opinion allowed the arresting officer to testify that he stopped the black Cadillac in which the defendants were travelling because of a radio report of suspects being in such a vehicle. *State v. Calloway*, 324 So. 2d 801, 809 (La. 1975). The testimony of what officers heard over the radio was admissible to explain the events leading to the arrest. *Id.*

The state *habeas* court concluded that Detective Dowdy's recounting of his conversation with Horton was not hearsay because "this conversation was used to explain the sequence of events leading to the arrest of the defendant from the viewpoint of the arresting officers." The holding was almost an exact quote from *Calloway,* which in turn had relied on a state-court precedent. *Id.* Regardless of whether that was a fair application of *Calloway*, we need to examine whether the state district-court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

The first decision, *Street*, involved an unusual set of facts. The Supreme Court held that "there were no alternatives that would have both assured the integrity of the trial's truth-seeking function and eliminated the risk of the jury's improper use of evidence." *Street*, 471 U.S. at 415. As to Atkins, even though showing the sequence of events leading to a suspect's arrest may help jurors understand the story of the investigation, the testimony was hardly an indispensable component of the prosecution's case.

As to *Bruton*, the other Supreme Court opinion that the state *habeas* court cited, we do not see that it was even being applied. Perhaps the court

cited it as a contrast both to *Street* and to Atkins' situation. The *Bruton* opinion does demonstrate one clear, but distinguishable, situation in which reversal is required based on the Confrontation Clause. The state court cited these two United States Supreme Court opinions, but its holding was based on the *Calloway* Louisiana Supreme Court opinion, which allowed officers to recount hearsay to explain certain investigatory steps.

We interpret the state court as having made two holdings. First, Detective Dowdy's testimony was not hearsay because "no references were made to the statements made by Mr. Horton and thus hearsay was not evident." We agree to the extent that Detective Dowdy's testimony did not restate or paraphrase at any length what Horton had told him. Nonetheless, the jurors were given a clear message about a specific piece of information Horton conveyed, namely, that Atkins was his accomplice. We do not see a holding in *Street*, *Bruton*, or any Supreme Court opinion, in which the Court permits a-wink-and-a-nod testimony from a police officer such that jurors are able to understand what has been said about a defendant in an out-of-court statement without the officer's having to say so explicitly. The second holding was that because "this conversation was used to explain the sequence of events leading to the arrest of the defendant from the viewpoint of the arresting officers," it was not hearsay. Neither *Street* nor *Bruton* made such a holding. Both decisions recognized that a prosecutor's professed purpose that the out-of-court statements are not being used for their truth does not automatically foreclose Confrontation Clause concerns.

We conclude that *Street* and *Bruton* do not even address the Confrontation Clause issue raised by Atkins' claims. To the extent the state district court was applying either opinion, it was an unreasonable application to hold they controlled as to these different facts. A precedent much closer

16

factually and analytically to what occurred here is the decision in *Gray v. Maryland*, 523 U.S. 185 (1998). When a police officer read a codefendant's confession into evidence at trial, the incriminating statements about the defendant were also read, but the witness said "deleted" or "deletion" instead of the defendant's name. *Id.* at 188. The Court reasoned that such redacted statements "obviously refer directly to someone, often obviously the defendant, and . . . involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id.* at 196. The admission of the codefendant's confession containing unstated but transparent references to the defendant violated the Confrontation Clause. *Id.* at 195.

Even closer factually is one of this court's opinions in which a detective testified that he "had a conversation with [the witness] and during this conversation, learned some information," and from that information, the detective testified he "was able to develop a suspect." *Taylor v. Cain*, 545 F.3d 327, 331 (5th Cir. 2008). The prosecutor then asked, "as per this end of your investigation, what was the name of your suspect?" *Id.* The detective named the defendant. *Id.* That testimony violated the defendant's right to confront his accusers. *Id.* at 336.

Our description of one of our own precedents may seem irrelevant, as Section 2254(d)(1) does not permit relief unless a state-court decision is inconsistent with clearly established Supreme Court authority. Nonetheless, the Supreme Court recognizes that a circuit court of appeal, in "accordance with [the] usual law-of-the-circuit procedures, [may] look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013). But "it may not canvass circuit decisions to determine

17

whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct." *Id.*

Similarly, we have described the proper understanding as being that "circuit precedent cannot *create* clearly-established law" for purposes of Section 2254(d)(1), but a circuit court may properly rely on one of its own decisions if that precedent held that a Supreme Court precedent clearly established a point of law. *Carter v. Stephens*, 805 F.3d 552, 556 (5th Cir. 2015). Our *Taylor v. Cain* opinion concluded that upholding the admission of this evidence was an unreasonable application of the law clearly established in *Ohio v. Roberts*, 448 U.S. 56, 65 (1980). *Taylor*, 545 F.3d at 335–36.

Having gone this far in the analysis of the Confrontation Clause, we go no further. To summarize, we have explained that the state district court did not apply relevant Supreme Court precedent. We identified a different Supreme Court precedent, existing at the time of the state-court decision under review here, that has considerable relevance to the Confrontation Clause issue. Exactly how it applies would need to be analyzed. We also identified a Fifth Circuit precedent on similar facts that purported to apply clearly established authority from the Supreme Court. We would need to consider whether each specific relevant holding in *Taylor* at least stated it was relying on clearly established Supreme Court authority. We leave open these questions because we conclude the answers will not affect the outcome of the appeal. What does control is the final issue we consider: was any error harmful?

## III.    *Harm from Confrontation Clause error*

Confrontation Clause violations are subject to harmless-error analysis. *Horn v. Quarterman*, 508 F.3d 306, 322 n.24 (5th Cir. 2007). The State concedes that it did not raise harmlessness in this case but urges us to consider

the possibility anyway. We have held that we have the discretion to reach the issue even *sua sponte*. *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010). We find it desirable in most AEDPA cases to consider harmlessness. For a federal court to order relief on a ground that was harmless is the kind of needless interference with a state-court judgment that AEDPA seeks to avoid. We will exercise our discretion and consider harmless error.

We first identify the standard we should apply in determining whether the constitutional violation amounted to harm. We reiterate that no state-court decision evaluated harmlessness. Without a reasoned state-court decision on the issue, no deference is due under AEDPA. *Gonzales v. Thaler*, 643 F.3d 425, 430 (5th Cir. 2011).

Generally, when a federal court reviews a state-court judgment of conviction, "a constitutional trial error is not so harmful as to entitle a defendant to *habeas* relief unless there is more than a mere reasonable possibility that it contributed to the verdict." *Billiot v. Puckett*, 135 F.3d 311, 318 (5th Cir. 1998) (quoting *Woods v. Johnson*, 75 F.3d 1017, 1026–27 (5th Cir. 1996)). In federal *habeas* review, the error must have "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "Actual prejudice" must be shown. *Id.* at 637. The *Brecht* standard applies even when, as here, the state court did not analyze the issue. *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007).

We introduced this part of the explanation with a caveat, that *generally* this is the approach. What may be different here is the fact that the State forfeited the issue. In other words, the question is whether the State's failure to raise harmlessness any earlier in the proceedings changes how we review harmlessness. Whether the State's silence was an intentional waiver of a

No. 19-30018

recognized potential issue is unclear.  "Forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment of a known right."  *United States v. Rodriguez*, 602 F.3d 346, 351 (5th Cir. 2010) (quoting *United States v. Arviso–Mata*, 442 F.3d 382, 384 (5th Cir. 2006)).  Our caselaw states that a "waived" issue, when the term is being used to refer to an issue intentionally not pressed on the court, usually will not be reviewed.  *Id.* at 350–51.  As we have already indicated, though, we can raise harmlessness *sua sponte*.  *Jones*, 600 F.3d at 541.  Whatever the cause of the State's failure, we can reach the issue.

In some situations, failure to raise an issue until the appeal results in review only for plain error.  *See United States v. Castellon-Aragon*, 772 F.3d 1023, 1024 (5th Cir. 2014).  Here, though, we are not considering a newly argued error that might justify reversing the district court after every previously raised argument failed to do so.  Instead, we are considering a new issue that might allow us to avoid setting aside the lower court's judgment.  Plain error is not the standard.

The Seventh Circuit set rules for reaching a previously unmentioned harmlessness issue when considering the direct appeal of a federal criminal conviction.  *See United States v. Giovannetti*, 928 F.2d 225, 227 (7th Cir. 1991).[1]  The court determined that for reaching forfeited arguments of harmless error in that context, "the controlling considerations are the length and complexity of the record, whether the harmlessness of the error or errors found is certain or debatable, and whether a reversal will result in protracted, costly, and ultimately futile proceedings in the district court."  *Id.*  We conclude that the

---

[1] This court approvingly cited the *Giovannetti* opinion in its discussion of whether we have the "discretion to decide legal issues that are not timely raised," also doing so in a direct appeal of a federal conviction.  *See United States v. Vontsteen*, 950 F.2d 1086, 1091–92 (5th Cir. 1992) (*en banc*).  The analysis was not of harmless error.

20

Seventh Circuit's opinion, which predated *Brecht* by two years and did not involve review of a state conviction, necessarily did not, indeed could not, take into account that the "application of a less onerous harmless-error standard on *habeas* [review of a state conviction] promotes the considerations underlying our *habeas* jurisprudence." *Brecht*, 507 U.S. at 623. We do not find *Giovannetti* persuasive for adopting a heightened standard in the *habeas* context from that identified in *Brecht*.

We return to the precedent that identified our discretion to reach a forfeited issue of harmless error. *Jones*, 600 F.3d at 541. There, the State argued for the first time in its surreply in district court that any Confrontation Clause violation, similar to the testimony here, was at worst harmless error. *Id.* at 540–41. This court discussed *Brecht* in some depth, without suggesting that because the issue had not been properly raised by the State, *Brecht* might not apply. *See id.* at 540. For example, the court stated that "the prejudice of constitutional error in a state-court criminal trial is measured by the 'substantial and injurious effect [or influence in determining the jury's verdict]' standard of *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L.Ed.2d 353 (1993)." *Id.* (quoting *Taylor*, 545 F.3d at 336). In *Jones*, the court analyzed the possibility of harmlessness enough to say: "we are convinced that the error here was not harmless" and, accordingly, do not "undertake a full analysis in light of the State's waiver." *Id.* at 541.[2]

Though we interpret *Jones* to have implied that the usual *Brecht* standard applies even when considering a late-brought argument of harmlessness, we see no clear precedential holding in *Jones* to that effect. We

---

[2] The Seventh Circuit, despite *Giovannetti*, has held that *Brecht* applies in reviewing a state conviction, even if the state forfeited the issue of harmlessness. *See Rhodes v. Dittmann*, 903 F.3d 646, 665 (7th Cir. 2018) (refusing to apply the *Giovannetti* standard of "certainty" as to harmlessness).

so hold now. Whether raised late by the State or even if only noticed by the court *sua sponte*, the same considerations apply as were explained in *Brecht*.

Reaching harmlessness and applying the usual review standard might appear to be giving more lenient treatment to the State's defaults than is given to those of defendants. True, applicants for *habeas* relief are often barred under AEDPA from raising new arguments. We see no inequity, though, in reaching harmless error in this appeal. The prohibition on reprosecution after an acquittal, *i.e.*, the double jeopardy bar, makes harmless error relevant only to a conviction. If a jury acquits, even multiple trial errors harmful to the prosecution cannot disturb that verdict. On appeal from a conviction, though, reaching harmlessness and applying the usual standard of review even when the issue has not been properly raised avoids reversals and retrials when the violation did not affect the initial proceedings. *See Giovannetti*, 928 F.2d at 227. A more general loosening of the tight AEDPA rules for review of a conviction is for Congress.

We now examine the harm from this potential error. The testimony which is the focus of the Confrontation Clause claim occurred because jurors were effectively informed that Horton told Detective Dowdy that Atkins was the second culprit. Whether that testimony had a substantial, injurious effect depends largely on the extent of other testimony identifying Atkins. Those with first-hand knowledge of the events were Jones, Bishop, and Harris. All three had been drinking alcohol just prior to the assault. According to a police officer, after the attack, the victims "had some bleeding head wounds." The three men all smelled of alcohol and had slurred speech, and all were "highly intoxicated." Jones died before trial, and the other two testified.

The victims knew Horton prior to the assault. Harris and Horton had been roommates for about six months, and on the morning of the assault and

theft, Harris had told Horton to move out of the apartment. Despite these connections, none of the victims could provide officers with more than Horton's nickname on the night of the crime. Harris testified that Atkins, whom he knew as J Money, "had been in the neighborhood a couple of times with" Horton. Bishop similarly testified to knowing Horton and to seeing Atkins a few times prior to the crime. During trial, both Harris and Bishop unequivocally identified Atkins as the assailant whom they had earlier known only as J Money.

There were some challenges made at trial to the identification. In addition to their intoxication, Harris after the assault "had trauma to his head," was bleeding, had bloodshot eyes, slurred his speech, and "had extreme trouble standing up." The defense, by calling Williams, sought to raise doubts about the victims' ability to have perceived the events, then to testify accurately about them, such as whether the door to the house was open or not, and whether there were other, unidentified people there before the robbery.

We recount the process that led to Atkins being identified as Horton's accomplice. On the night of the offense, Harris and Bishop identified their attackers as J Money and O. Three days later, Detective Dowdy again met with Harris and Jones. Harris for the first time stated that he had learned the actual name of one of the individuals involved in the crime. He discovered Horton's name after finding documents left in their previously shared apartment. It was almost two weeks before either witness identified Atkins. Harris testified at trial that a week after the assault, the couple who lived below his apartment told him that the other offender had been with them at some point, and someone had taken a photograph of him with the baby who lived in the lower-level apartment. This neighbor supposedly "knew what happened" and that is why the neighbor gave Harris the photograph. It was

this photograph that Harris provided to officers. Detective Dowdy created a photographic lineup with the neighbor's picture for Bishop to review. Bishop selected Atkins' photograph. This lineup would have been tainted if Harris had earlier shown the photograph to Bishop. At trial, Harris said he showed Bishop the photograph before giving it to police, but Bishop testified that though he knew about the photograph, he had not seen it before the photographic lineup.

The validity of the lineup was challenged on direct appeal. The state court of appeal held that the "lineup was fair and reasonable," and jurors were able to judge the credibility of both Harris and Bishop in their identifications. *Atkins*, 74 So. 3d at 241. It does not appear the claim was made to that court that Bishop was shown the photograph before the lineup. We do not consider how that omission would affect the deference that otherwise would be owed to the court of appeal on a finding of fact. The court also found that Bishop and Harris "already knew Atkins and his accomplice." *Id.* (emphasis and footnote removed). This finding of prior knowledge is not an "unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), and is owed deference.

In summary, the two witnesses who were victims of the crime had some familiarity with Atkins before the offense. Each positively identified Atkins. On cross-examination, defense counsel did not seriously challenge either witness's ability to identify the attacker on any grounds, including intoxication. At least one witness, and perhaps both, knew the person's nickname, J Money. Harris and Bishop were intoxicated, perhaps significantly so. We have no evidence to support, though, that their powers of perception were so affected as to be unable to recognize that someone they had seen at least on a few earlier occasions was attacking them. The cross-examination of the two witnesses raised no reasonable questions about the identifications

No. 19-30018

other than the potentially tainted photographic lineup. Harris, though, was not affected by that possibility, only Bishop. We conclude that any error was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776.

* * *

No judge in active service having requested a poll of the court on the petition for rehearing *en banc*, that petition is DENIED. The petition is converted to one for rehearing by the panel, and that petition is GRANTED. We AFFIRM the district court's denial of relief.

No. 19-30018

GREGG COSTA, Circuit Judge, dissenting in part:

There are winners and losers in litigation. So the measure of the justice system is not whether the losing party is happy with the result. It's whether that party got a fair shake. And fair treatment depends on the neutral application of procedural rules. That evenhandedness is part of what is meant by the "rule of law" or "equal justice under law," ideals that are guiding lights of our justice system.

A neutral justice system cannot apply a double standard for procedural rules such as the one that should resolve this case: "Ordinarily a party may not present a wholly new legal issue in a reviewing court." CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 9C FEDERAL PRACTICE & PROCEDURE § 2588. That rule is a—perhaps *the*—bedrock principle of appellate review. *See generally Raising New Issues on Appeal*, 64 HARV. L. REV. 652, 652–55 (1951). The preservation requirement is "as old as the common-law system of appellate review." Robert J. Martineau, *Considering New Issues on Appeal: The General Rule and the Gorilla Rule*, 40 VAND. L. REV. 1023, 1061 (1987); *see Clements v. Macheboeuf*, 92 U.S. 418, 425 (1875); 2 WILLIAM BLACKSTONE, COMMENTARIES \*455; Andrey Spektor & Michael A. Zuckerman, *Ferrets and Truffles and Hounds, Oh My: Getting Beyond Waiver*, 18 GREEN BAG 2d 77, 79–81 (2014).

The rule against hearing new issues on appeal comes up so often that it goes by many names. Waiver is the most common term, though forfeiture is more accurate (as we are talking about failing to raise an issue in the trial court, not affirmatively abandoning it). *United States v. Olano*, 507 U.S. 725, 733 (1993). It's also called the preservation rule. Ian Speir & Nima H. Mohebbi, *Preservation Rules in the Federal Court of Appeals*, 16 J. APP. PRACTICE & PROCESS 281 (2015). Most punchy is "raise-or-lose." *United States v. Roberts*, 119 F.3d 1006, 1013 (1st Cir. 1997); Tory A. Weigand, *Raise or Lose:*

No. 19-30018

*Appellate Discretion and Principled Decision-Making*, 17 SUFFOLK J. TRIAL &
APP. ADVOC. 179 (2012). Regardless of the label used, "[t]he rule that points
not argued will not be considered is more than just a prudential rule of
convenience; its observance, at least in the vast majority of cases, distinguishes
our adversary system of justice from the inquisitorial one." *United States v.
Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring).

The state violated this basic preservation requirement when it comes to
the harmlessness argument it now so vigorously pushes. There was not a peep
about harmlessness in the district court. As a result, the original panel
opinion—issued after a full airing of the case, including oral argument—
decided not to forgive the state's forfeiture of the issue. *Atkins v. Hooper*, 969
F.3d 200, 210 (5th Cir. 2020). We recognized the discretion we have to do so
but saw "no reason for exercising it here." *Id.* I would stand by that sound
determination.

The panel majority, however, does a 180 on rehearing. There is nothing
wrong with that as a general matter. For more than 99% of cases, the court of
appeals is the end of the road. The rehearing stage is usually the last chance
to get the case right. Judges thus must guard against the certitude and pride
that can get in the way of correcting one's mistakes. Openness to
reconsideration is a good thing. But this reversal is not due to any error,
factual or legal, that the rehearing petition identified. Instead, the panel
majority flips a judgment call on whether to forgive the state's failure to
preserve the harmlessness issue. The rehearing petition does not cite any new
factors that should influence that decision. The majority cites one thing that
has been true of this case from the very beginning: it is a habeas petition. Maj.
Op. 18.

No. 19-30018

I see three problems with the notion that it is "desirable in most AEDPA cases to consider harmlessness" even when it was not raised in the trial court. *Id.*

First, the discretionary nature of recognizing forfeiture is not unique to AEDPA. A court always has discretion to forgive forfeiture (or even waiver). *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 487 (2008); *Singleton v. Wulff*, 428 U.S. 106, 121 (1976); Weigand, *supra,* at 180–81, 187–97 (chronicling Supreme Court caselaw on discretion to overlook forfeiture); Spektor & Zuckerman, *supra*, at 79, 82. No court says there is some special rule for habeas that requires consideration of harmlessness when the state fails to assert it. *See Jones v. Cain*, 600 F.3d 527, 540–41 (5th Cir. 2010); *Rhodes v. Dittmann*, 903 F.3d 646, 664 (7th Cir. 2018) (recognizing discretion in this area and citing cases from the Fifth, Sixth, and Tenth Circuits holding the same). Nor, until today, has any court created a presumption to forgive a failure to raise harmlessness in AEDPA cases. The traditional default rule is against allowing a party to present an issue for the first time in the appellate court. *See, e.g.*, *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 531 (1st Cir. 1993) (Boudin, J.) (noting that it "is and should be uncommon" for courts to forgive waived or forfeited issues). As we have said, forfeiture should be forgiven only in "extraordinary circumstances." *Does 1-7 v. Abbott*, 945 F.3d 307, 312 (5th Cir. 2019) (quotation marks omitted). And like most discretionary decisions, the decision to excuse a forfeiture should be "exercised on the facts of individual cases" rather than dictated by "general rule[s]." *Singleton*, 428 U.S. at 121; *id.* (noting two factbound situations when forgiving forfeiture might be appropriate: "where the proper resolution is beyond any doubt . . . or where 'injustice might otherwise result'" (quoting *Hormel v. Helvering*, 312 U.S. 552, 557 (1941))). There is no textual or precedential support for a categorical

28

presumption that points in the opposite direction of the general forfeiture rule and excuses the state's failure to raise harmlessness in AEDPA cases. *See Rhodes*, 903 F.3d at 664 ("Procedural rules apply to the government as well as to defendants." (quotation marks omitted)).

Second, the lack of textual support for special leniency when it comes to the state's forfeiture of harmlessness contrasts sharply with AEDPA's explicit provision for leniency for exhaustion: "A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3); *see Taylor v. Cain*, 545 F.3d 327, 333 (5th Cir. 2008). In other words, AEDPA says the state cannot forfeit exhaustion, it must affirmatively waive exhaustion. There is nothing like that in the statute for harmlessness. "We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341 (2005).

Lastly, and circling back to my opening point, the leniency the majority affords the government's forfeiture is hardly, if ever, shown when habeas prisoners fail to raise an issue in the district court. One can look far and wide yet not find a decision from our court excusing a prisoner's failure to preserve. We routinely apply forfeiture to habeas prisoners, without even contemplating using our discretion to excuse it. *See, e.g.*, *Howard v. Davis*, 959 F.3d 168, 172 (5th Cir. 2000); *Malone v. Wilson*, 791 F. Appx 505, 506 (5th Cir. 2020); *Thompson v. Davis*, 916 F.3d 444, 460 (5th Cir. 2019). We apply the raise-or-lose rule to prisoners so strictly that it was not enough when one facing a life sentence raised an issue "in general" (and cited the right statutory subsection

in his opening brief), because his argument was "inconsistent" and unclear. *Poree v. Collins*, 866 F.3d 235, 250 (5th Cir. 2017).

If anything, this double standard—what's good for the prisoner is not good for the government—has it backwards. Courts have long recognized that parties with liberty interests at stake present the strongest case for excusing forfeiture. *United States v. Atkinson*, 297 U.S. 157, 160 (1936) (stating that "[i]n exceptional circumstances, especially in criminal cases," appellate courts could "notice errors to which no exception has been taken"); *Raising New Issues on Appeal, supra*, at 653 ("[R]aising new issues in criminal cases . . . rests on the same considerations as are present in civil cases, but has the additional factor that the result may be so drastic for the defendant and the burden to the state of a new trial so minor that courts tend to be more lenient in hearing a new matter on his behalf."); *see also* Weigand, *supra*, at 292–93 (noting that there is usually more reluctance to find plain error in civil cases because liberty interests are generally "absent"). What is more, in habeas litigation the state has counsel with subject matter expertise; the prisoner is typically litigating pro se. Yet despite our "traditional disposition of leniency toward pro se litigants," *Spotville v. Cain*, 149 F.3d 374, 377 (5th Cir. 1998), we routinely enforce against them AEDPA's "procedural pitfalls that prevent prisoners from challenging potentially unconstitutional convictions," *Rhodes*, 903 F.3d at 664. Neutral application of the law requires the same vigilance when it comes to a procedural pitfall of the state's own making. A presumption that excuses the state, but not pro se litigants, for failing to raise an issue in the district court is not consistent with "equal justice under law." *Cf.* Martineau, *supra*, at 1061 (arguing that "inconsistency" in applying forfeiture "is destructive of the adversary system, causes substantial harm to the interests that the general rule is designed to protect, and is an open invitation to the appellate judges to

'do justice' on ad hoc rather than principled bases"); Weigand, *supra*, at 180–81 (recognizing that inconsistent application of forfeiture rules casts doubt on the courts' legitimacy).

For these reasons, I would stick with the original decision not to excuse the state's unjustified failure to raise harmlessness in the trial court. Applying our prescribed case-by-case discretion rather than an extratextual presumption for AEDPA cases, this does not come close to the "extraordinary circumstances" that would justify forgiving the forfeiture. *Does 1-7,* 945 F.3d at 312 (cleaned up).

The only conceivable justification would be if the Confrontation Clause error were harmless "beyond any doubt."[1] *Singleton*, 428 U.S. at 121. When the outcome of a retrial is "certain," it would be inefficient to waste everyone's time with a redo. *United States v. Giovannetti*, 928 F.2d 225, 227 (7th Cir. 1991) (Posner, J.).[2] The need for the forfeited harmlessness issue to be "beyond any doubt" or "certain" casts the issue in a much different light than the majority's assessment, which gives the state a free pass and considers harmlessness as if the state had followed the rules and raised it from the beginning. Taking the hearsay out of the equation, the state's case depended on the testimony of two eyewitnesses who were drunk when the crime took

---

[1] Other situations to excuse forfeiture, when a manifest injustice would result or the neglected issue is a pure question of law, do not apply. *See Law Funder, L.L.C. v. Munoz*, 924 F.3d 753, 759 (5th Cir. 2019).

[2] The majority opinion casts doubt on *Giovannetti* because it was pre-AEDPA. But its certainty standard is the same "beyond any doubt" standard that the Supreme Court has recognized as one of the extraordinary circumstances that, as a general matter, may excuse forfeiture. *Singleton*, 428 U.S. at 121. The majority opinion skips over the need for an extraordinary circumstance to justify looking past forfeiture (unless it's saying that there is always an extraordinary circumstance in an AEDPA case). That failure to identify a case-specific extraordinary circumstance is the source of my disagreement, not the application of *Brecht* once there is a valid reason for overlooking forfeiture.

place and who could not give Atkins's name when first questioned.  Maj. Op. 22–23.  The prosecution thought the accomplice Horton's identification of Atkins was important enough to its case that it featured it as the coup de grace in opening, introduced it in violation of the Confrontation Clause during trial, and again mentioned it at closing.  The state's continued reliance on Horton's out-of-court tying of Atkins to the crime is not surprising—testimony of an accomplice is potent evidence.  Indeed, if the Confrontation Clause error were obviously harmless, why didn't the panel recognize that the first time?  Because harmlessness is not "beyond any doubt," we should not forgive the state's failure to timely raise it.  *Singleton*, 428 U.S. at 121; *see also Giovanetti*, 928 F.2d at 227 (refusing to forgive government's forfeiture of harmlessness in collateral review case because outcome of question was not certain).

Atkins is the rare habeas prisoner who can overcome the numerous statutory obstacles that AEDPA places on those seeking to vacate their convictions based on the violation of important constitutional rights, which confronting one's accusers surely is.  Judges, scholars, and commentators criticize AEDPA for erecting too many of those hurdles.  *See, e.g., Davis v. Straub*, 430 F.3d 281, 296 (6th Cir. 2005) (Merritt, J., dissenting); Lincoln Caplan, *The Destruction of Defendants' Rights*, NEW YORKER (June 21, 2015) (arguing that AEDPA "gutted the federal writ of habeas corpus"); Bryan A. Stevenson, *Confronting Mass Imprisonment and Restoring Fairness to Collateral Review of Criminal Cases*, 41 HARV. C.R.-C.L. REV. 339, 360–62 (2006).  But when it comes to the requirements that AEDPA actually imposes, those complaints should be directed at Congress.  Stevenson, *supra*, at 360–61 (calling for repeal of the law).  What courts should not be doing is inventing new requirements not found in AEDPA's text (perhaps in its emanations or penumbras?)—like a rule that lets the state off the hook when it forfeits an

argument, even though we regularly hold other litigants to what they argue in the trial court.